THE STATE, EX REL. KLAPP, PROS. ATTY., *v.* DAYTON POWER & LIGHT CO. ET AL.

(No. 314—Decided January 18, 1962.)

*Mr. Richard K. Wilson,* director of law, city of Piqua, *Mr. Haveth E. Mau* and *Messrs. Pogue, Helmholz, Culbertson & French,* for relator.

*Messrs. Shipman & Utrecht, Mr. Julian de Bruyn Kops* and *Mr. J. R. Newlin,* for respondents.

SHERER, J.  Relator, on behalf of the city of Piqua, has instituted this action in quo warranto seeking an order of this court (1) adjudging the respondent Dayton Power and Light

Company to be unlawfully assuming a franchise, right, privilege and permission; (2) ousting and prohibiting this respondent from using the public streets, lanes, alleys, commons and other public places of the city of Piqua for the distribution of electricity to the citizens and inhabitants thereof and other persons, firms and corporations therein; and (3) ordering the removal of all respondent's poles, guy wires, transformers, standards, wires and all other appurtenances, equipment and apparatus under, upon and over the ground used by it for the distribution and transmission of electricity to the citizens, inhabitants, firms and corporations in such city and for any purpose other than as required solely for transmission by it of electricity from a point or points outside the corporate limits of such city through that city to points outside the corporate limits of the city for distribution of electricity to respondent's customers outside the corporate limits of such city.

Relator alleges that on January 29, 1884, the council of the city of Piqua adopted an ordinance granting to the Piqua Edison Illuminating Company and its successors the right, for the purpose of furnishing illuminating light and heat and power, to erect their poles and stretch their wires thereon through the streets, alleys and public ways of the city of Piqua.

Relator alleges that respondent Dayton Power and Light Company is a corporation duly organized and acting under and by virtue of the laws of the state of Ohio and that respondent has succeeded to the rights and obligations of Piqua Edison Illuminating Company under the ordinance of January 29, 1884.

Relator alleges further that on March 25, 1933, and by filing this action, the city of Piqua terminated the rights, privileges and franchise of respondent Dayton Power and Light Company under the ordinance of January 29, 1884, and that since that date such respondent has been and now is offending against the ordinances of such city and the laws of the state of Ohio in maintaining its poles, wires, etc., upon, over and under the streets of such city and in furnishing electricity to persons, firms and corporations within the city.

Relator alleges that respondent The Irving Trust Company claims some interest in the property of respondent Dayton Power and Light Company.

These respondents have demurred to relator's amended pe-

tition on the ground that it does not state facts which show a cause of action in that it does not show that the Public Utilities Commission of Ohio has allowed, required or consented to the abandonment or withdrawal of respondent Dayton Power and Light Company's electric facilities and the electric service rendered thereby to consumers in the city of Piqua, as is required by Sections 4905.20 and 4905.21, Revised Code.

Relator will be hereafter referred to as "Piqua" and respondent Dayton Power and Light Company as the "Power Company."

Piqua argues that the granting of permission by a municipality, by ordinance, for use of its streets for electric lines and the acceptance thereof by a utility company constitute a contract, citing *East Ohio Gas Co.* v. *Akron* (1909), 81 Ohio St. 33, which held in paragraph two of the syllabus:

"When a municipal corporation, by ordinance, gives its consent that a natural gas company may enter the municipality, lay down its pipes therein and furnish gas to consumers upon terms and conditions imposed by the ordinance, which are accepted in writing by said company, such action by both parties constitutes a contract and the rights of the parties thereunder are to be determined by the contract itself." (Followed in *East Ohio Gas Co.* v. *Cleveland*, 106 Ohio St. 489, 502.)

Piqua argues further that the Legislature cannot impair the obligations of such a contract by law enacted subsequently, citing *East Ohio Gas Co.* v. *Cleveland* (1922), 106 Ohio St. 489, 502. The amended Miller Act, which became effective in 1919, provided (Sections 504-2 and 504-3, General Code), insofar as pertinent here:

Section 504-2. "No * * * public utility as defined in Section 614-2a of the General Code furnishing service or facilities within the state of Ohio, shall abandon or be required to abandon or withdraw any main * * * electric light line * * * or any portion thereof, pumping station, generating plant, power station, or service station of a public utility, or the service rendered thereby, which has once been laid, constructed, opened and used for public business, nor shall be closed for traffic or service thereon, therein or thereover except as provided in Section 504-3. * * *."

Section 504-3, General Code, insofar as applicable, reads:

Section 504-3. "Any * * * such public utility, or political

subdivision desiring to abandon or close, or have abandoned, withdrawn or closed for traffic or service all or any part of such line or lines, pumping stations, generating plant, power station or service station shall first make application to the Public Utilities Commission * * *."

It is the contention of the Power Company that the ordinance of 1884 is *ultra vires* and void, and that, there being no franchise contract in existence between Piqua and the Power Company in 1919 when the amended Miller Act (Sections 504-2 and 504-3, General Code) became effective, the rule announced in *East Ohio Gas Co.* v. *Cleveland,* 106 Ohio St. 489, cannot apply because, in the absence of a contract, there is no obligation to be impaired. We agree with this contention of the Power Company.

The question to be determined is whether the city of Piqua can terminate the Power Company's use of its streets and alleys for furnishing service to persons and firms located within that city without recourse to the Public Utilities Commission as provided by Sections 504-2 and 504-3, General Code, now Sections 4905.20 and 4905.21, Revised Code. There is no question of the right of the Power Company to the use of such streets for the purpose of the transmission of electric power through Piqua to points beyond.

In effect, when the ordinance of 1884 was passed by the council of Piqua, Ohio law provided that:

"The council shall have the care, supervision and control of all public highways, streets, avenues, alleys, sidewalks, public grounds, and bridges within the corporation, * * *" 75 Ohio Laws 161, at 388.

In *Hardin-Wyandot Lighting Co.* v. *Upper Sandusky* (1916), 93 Ohio St. 428, the court reviewed Ohio law respecting electric light companies and said, at page 438:

"The first enactment touching the power of companies organized for the purpose of supplying electricity for lighting streets, etc., was passed May 12, 1886 (83 Ohio Laws 143) [now codified in pertinent part in Section 4933.03, Revised Code], and authorized such companies to construct lines for conducting electricity for power and light purposes through alleys, etc., 'with the consent of the municipal authorities. * * *' "

That case points out, pages 438, 439, that in the following

year, January 26, 1887 (84 Ohio Laws 7), an act was passed providing that the provisions relating to telegraphs and telephones, so far as same might be applicable, shall apply to companies organized to furnish electric light and power. The effect of the law, then, was that electric companies derived their power to occupy municipal streets from the state.

The court said further, page 439, that on April 21, 1896 (92 Ohio Laws 205), this latter act was amended and that:

"* * * This amendment of 1896 provided that in order to subject the same to municipal control alone, no person or company shall place, construct or maintain any line for lighting through any street, alley, etc., without the *consent* of the municipality. These provisions substantially have been carried into the General Code in Sections 9192 and 9193."

In paragraph two of the syllabus the court stated the law as follows:

"2. The act of April 21, 1896, Sections 9192 and 9193, General Code, subjected electric light and power companies to 'municipal control alone' and provides that no such company shall occupy the streets, alleys, etc., of any city, town or village, with its equipment to conduct electricity for lighting, heating or power purposes without the 'consent of such municipality.'"

When the instant action was commenced on March 25, 1933, the following statute, Section 9193, General Code, was in effect:

"In order to subject such companies to municipal control alone, no person or company shall place, string, construct or maintain a line, wire, fixture or appliance of any kind to conduct electricity for lighting, heating or power purposes through a street, alley, lane, square, place or land of a city or village without the consent of such municipality."

Hence, disregarding the Miller Act of 1919, Sections 504-2 and 504-3, General Code (now Sections 4905.20 and 4905.21, Revised Code), Piqua had clear statutory authority on March 25, 1933, to terminate its consent (by sufferance) to the maintenance of its lines by the Power Company within that city.

The Miller Act, in 1919, invested jurisdiction over the abandonment of certain services by railroads and public utilities in the Public Utilities Commission, Sections 504-2 and 504-3, General Code, now Sections 4905.20 and 4905.21, Revised Code. The Act limited the jurisdiction of the commission to abandon-

ment or withdrawal of the (Section 504-2) "main track * * * or depot of a railroad or main pipe line, gas line * * * electric light line, * * * or the service rendered thereby * * *." Section 504-3, General Code, now Section 4905.21, Revised Code, provided, in pertinent part, that "any such public utility, or political subdivision desiring to abandon or close, or have abandoned, withdrawn or closed for traffic or service all or any part of *such line* * * * shall first make application to the Public Utilities Commission * * *." (Emphasis ours.) "Such line" used in Section 504-3, General Code, refers to the "main line" or the service rendered thereby as used in Section 504-2, General Code.

The Revised Code, Sections 4905.20 and 4905.21, became effective after this action was commenced, and Section 1.20, Revised Code, makes the General Code effective as to pending actions.

The next question to be considered is the effect of Section 3 of Article XVIII, the Home Rule Amendment to the Ohio Constitution, adopted in 1912.

Section 3, Article XVIII, Ohio Constitution, provides:

"Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."

This question was noted, but neither discussed nor decided, by Bevis, J., in *State, ex rel. Wear, v. Cincinnati & Lake Erie Rd. Co.* (1934), 128 Ohio St. 95, at page 100.

In the *Wear case,* Judge Bevis said (page 101):

"* * * The public is interested in the continuance of the service, and that interest the Utilities Commission is empowered to conserve. This consideration is of especial force in the case of a railway company, whose patrons include the inhabitants of many other communities besides the one which is party to the particular controversy. *To permit discontinuance of the line through Springfield would entail the discomfiture of people in Cincinnati, Toledo, Columbus, and all intermediate points.*" (Emphasis ours.)

Such language makes it clear that the subject matter to which the Miller Act was applied in that case was not one relating solely to "local self-government" within the meaning of Article XVIII, Section 3, above. Therefore, that case, and any

others involving other than purely intra-municipal service, may be disregarded. Likewise, any decisions in which a public utility sought to abandon its service may be ignored, for in such cases no question of municipal home-rule power could be involved. In the case before us, we are concerned solely with the municipal power under the Constitution to require an electric utility company to vacate the municipal streets, etc., and thereby to discontinue its intra-city service only.

Is this the exercise of a power of "local self-government"?

In the case of *Perrysburg* v. *Ridgway*, 108 Ohio St. 245, the court held, in the syllabus:

"1. Since the Constitution of 1912 became operative, all municipalities derive all their 'powers of local self-government' from the Constitution direct, by virtue of Section 3, Article XVIII, thereof.

"2. The power to establish, open, improve, maintain and repair public streets within the municipality, and fully control the use of them, is included within the term 'powers of local self-government.'

"3. The above constitutional grant of power to municipalities is 'self-executing,' in the sense that no legislative action is necessary in order to make it available to the municipality.

"4. The exercise of 'all powers of local self-government,' as provided in Article XVIII, Section 3, is not in any wise dependent upon or conditioned by Section 7, Article XVIII, which provides that 'a municipality *may* adopt a charter,' etc."

In the case of *Billings* v. *Cleveland Ry. Co.* (1915), 92 Ohio St. 478, the court held, in the first paragraph of the syllabus:

"1. The granting of permission and the making of a contract to construct and operate a street railway in the streets of a city or village is a matter that may be provided for in a charter adopted by the municipality under Article XVIII of the Constitution."

These municipal powers of local self-government cannot be limited by general laws passed by the Legislature, as local police, sanitary and similar regulations can be limited if they conflict with general laws. *State, ex rel Canada,* v. *Phillips* (1958), 168 Ohio St. 191.

Municipalities have been granted the right to own and operate public utilities, to supply themselves and their inhabitants,

by Section 4, Article XVIII, Ohio Constitution. This constitutional right cannot be impaired by legislative action. *Swank* v. *Shiloh* (1957), 166 Ohio St. 415. Also, in creating the Public Utilities Commission and defining its jurisdiction, the Legislature excepted utilities operated by a municipality. Section 4905.02, Revised Code.

We have noted that when this action was filed on March 25, 1933, Section 9193, General Code, was in effect and provided:

"In order to subject such [electric] companies to municipal control *alone,* no person or company shall place, string, construct or *maintain* a line, wire, fixture, or appliance of any kind to conduct electricity for lighting, heating or power purposes through a street, alley * * * without the consent of the municipality." (Emphasis ours.)

The powers of home rule having been extended by Article XVIII, above, alike to charter and noncharter cities (*Perrysburg* v. *Ridgway* (1923), 108 Ohio St. 245), it follows that the rule quoted above from the *Billings case* is applicable to a municipal ordinance. Therefore, from 1912, when Article XVIII, Ohio Constitution, was adopted, until 1919, when the Miller Act was enacted, Piqua possessed the power, not only by statute, Section 9193, General Code, but derived directly from the Constitution as well, to grant or withhold consent to the use of its streets by a public utility (electric), provided it did not "extend its powers beyond municipal limits."

In seeking to oust the Power Company, Piqua is attempting to exercise a power of "local self-government" conferred upon it by Section 3, Article XVIII of the Ohio Constitution, without recourse to the Miller Act, Sections 504-2 and 504-3, General Code, as amended in 1919 and as in effect when this action was filed March 25, 1933, now Sections 4905.20 and 4905.21, Revised Code. But Piqua's powers of local self-government granted by Section 3 are limited therein. In *Benjamin* v. *Columbus* (1957), 167 Ohio St. 103, Taft, J., writing the opinion for the court, said, at page 108:

"The 'powers of local self-government' conferred upon municipalities by this constitutional provision [Section 3, Article XVIII] include the power to enact local legislation, except to the extent that limitations upon that legislative power have been set forth in the Constitution. Obviously, one such limitation is that

any 'police, sanitary or other similar regulations' that are adopted may be enforced only 'within' the municipality's limits and cannot 'conflict with general laws.' * * *''

*Cleveland Telephone Co.* v. *Cleveland* (1918), 98 Ohio St. 358, holds, in paragraph three of the syllabus:

"3. An ordinance fixing the rate that may be charged for telephone services by a telephone company within the limits of a municipality, is a local police regulation, within the meaning of that term as used in Section 3 of Article XVIII of the Constitution of Ohio."

In *Board of County Commissioners of Franklin County* v. *Public Utilities Commission* (1923), 107 Ohio St. 442, 30 A. L. R. 429, it is said in the opinion of the court by Marshall, C. J., at pages 451 and 452:

"* * * Counsel have raised the question of the validity of the Miller Act and the question of its constitutionality cannot therefore be avoided. The authority for this legislation rests upon the police power of the state. The police power is inherent in sovereignty. It is not brought into existence by the Legislature. All legislative action upon subjects where the police power is involved is merely a recognition of a power already existing. Legislation in furtherance of the police power is only limited by the public welfare and the inhibition of the people's Constitution. The Miller Act did not create the right of the sovereign state to stand guard over the abandonment or withdrawal of utility service. *It merely regulated the mode of its exercise.* * * *'' (Emphasis ours.)

The enactment of Sections 504-2 and 504-3, General Code, commonly denominated the "Miller Act," has likewise been said to be a valid exercise of the police power of the state in regulating public utilities in *Lake Shore Electric Ry. Co.* v. *State, ex rel. Martin* (1932), 125 Ohio St. 81, at 86. But, in both those cases last mentioned above, we have the inter-city rather than intra-city operation of a public utility involved.

If Piqua, in seeking to oust the Power Company, was exercising a police power, then such action conflicts with the "Miller Act" and the demurrer of the Power Company must be sustained.

We hold that Piqua, in filing this action seeking to oust the Power Company, is exercising a police power in a manner that

conflicts with general laws of the state applicable to the subject matter, to wit, the "Miller Act," Sections 504-2 and 504-3, General Code, now Sections 4905.20 and 4905.21, Revised Code.

The demurrer of the Power Company must be sustained.

*Demurrer sustained.*

CRAWFORD, P. J., and KERNS, J., concur.